UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-81253-CIV-MARRA/MATTHEWMAN

ACETO CORPORATION,
a New York corporation,

      Plaintiff,

vs.

THERAPEUTICSMD, INC.,
a Nevada corporation,
BOCAGREENMD, INC.,
a Nevada corporation,

      Defendants.
_____/

## OPINION AND ORDER ON MOTION TO DISMISS

**THIS MATTER** is before the Court upon Defendants' Motion to Dismiss

Complaint and for More Definite Statement [DE 8].  The Court has carefully

considered the motion, response, reply, and is otherwise fully advised in the

premises.

**Introduction**[1]

Plaintiff, Aceto Corporation ("Plaintiff" or "Aceto") is an international

marketing, sales and distribution company focused on the sourcing and distribution of

human health products (including finished dosage form generics and nutritionals),

pharmaceutical ingredients (including pharmaceutical intermediates and active

_____

[1] The following comes directly from the Complaint and is accepted as true for
purposes of this motion.  *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

pharmaceutical ingredients), and performance chemicals (including specialty chemicals and agricultural protections products).  Compl. ¶ 3.  Defendant BocaGreenMD, Inc. ("BocaGreenMD") is a wholly owned and directly controlled subsidiary of Defendant TherapeuticsMD, Inc. ("TherapeuticsMD").  Compl. ¶ 6. Plaintiff alleges TherapeuticsMD and BocaGreenMD are engaged in the production, marketing, promotion and sale of a generic line of prenatal vitamins being marketed and sold under the name "Prena1," throughout this country in violation of Aceto's rights.  Compl. ¶ 7.   Plaintiff brings this action because of "Defendants pattern of ongoing wrongful actions and improper competitive conduct relating to the unauthorized use, marketing, promotion and sale of the unique Quatrefolic Products (and the federally registered trademarks associated therewith) in direct violation of Aceto's legal rights to the same pursuant to a licensee arrangement."  DE 11.

Aceto has filed a Complaint against TherapeuticsMD and BocaGreenMD (together, "Defendants") for Federal Unfair Competition and False Designation of Origin and False and Misleading Representations pursuant to the Lanham Act, 15 U.S.C. § 1125(a) (Count I); False Advertising pursuant to the Lanham Act, 15 U.S.C. § 1125(a) (Count II), common law unfair competition (Count III), violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") pursuant to Fla. Stat. § 501.201 *et seq.* (Count IV); statutory injury to business reputation and dilution pursuant to Fla. Stat. § 495.151 (Count V), common law unjust enrichment (Count VI); misappropriation and conversion (Count VII), tortious interference (Count VIII), and

declaratory and supplemental relief pursuant to 29 U.S.C. §§ 2201 and 2202 (Count IX).  DE 1.

<u>Allegations</u>

Aceto is an established international marketing, sales and distribution company which is a global leader in the marketing, sales and distribution of human health, pharmaceutical ingredients and performance chemical products.  Compl. ¶ 14.  Aceto functions as a virtual manufacturing company, distributing more than 1,100 compounds used principally as raw materials in the production of pharmaceutical and chemical products.  Compl. ¶ 15.  Aceto is an industry leader in the pharmaceutical ingredient supply industry, and has a long established reputation for excellence in the industry.  With respect to its business operations, Aceto has strategic relationships with manufacturers of pharmaceutical, nutraceutical, agricultural and specialty chemical products in the United States and internationally which serve as a valuable resource for Aceto's customers, enabling them to procure high-quality ingredients and vital chemical-based products necessary for their diverse and complex applications.  Compl. ¶ 16.

Among Aceto's multiple business segments, Aceto acquires and maintains certain exclusive marketing, sale, and distribution rights, including related patent rights and trademark rights for numerous active pharmaceutical ingredients ("APIs") and other high quality pharmaceutical and nutraceutical ingredients which Aceto supplies to its customers, including various pharmaceutical companies.  Compl. ¶ 17.

Aceto's ability to control properly the marketing, sales, and distribution strategies of its pharmaceutical/nutraceutical ingredient products is critical to the success of Aceto's business.  Compl. ¶ 18.  Likewise, Aceto's ability to ensure the quality and effectiveness of its products and pharmaceutical/nutraceutical ingredient products has developed substantial customer loyalty and customer goodwill which is critical to the success of Aceto's business.  Compl. ¶ 19.

Pursuant to an exclusive distribution and supply agreement with the product manufacturer, Gnosis S.P.A. of Milan, Italy ("Gnosis"), dated January 1, 2011, Aceto is the exclusive licensee in the United States to market, sell, and distribute a patented pharmaceutical ingredient product manufactured by Gnosis, and known as Quatrefolic, which is a glucosamine salt[2] powder (referred to herein as the "Quatrefolic Products").  Compl. ¶ 20.  Pursuant to its exclusive distribution agreement with Gnosis, for prescription purposes Aceto has the exclusive license and rights within the United States to use, promote and sub-license the trademarks and trade-names associated with the Quatrefolic Products, including but not limited to, the registered trademark Quatrefolic & Design, United States Trademark Registration No. 3,799,826 (collectively referred to herein as the "Quatrefolic Mark").  Compl. ¶ 21.

---

[2] chemical name: N-[4-[[2-amino-5-methyl-1,4,5,6,7,8-hexahydro-4-oxo-(6S) pteridinyl) methyl]amino] benzoyl]- L-glutamic acid glucosamine salt.

Pursuant to its exclusive distribution agreement with Gnosis, for prescription purposes Aceto also has the exclusive license and rights within the United States to use, sell, offer for sale and import the patented Quatrefolic Products under United States Patent No. 7,947,662, and the related pharmaceutical ingredient products. Compl. ¶ 22.  The Quatrefolic Mark has been prominently utilized in connection with all aspects of the marketing, advertising, promotion and sale of the Quatrefolic Products, including product packaging, marketing brochures, websites, print advertising, informational and promotional materials printed and distributed in connection with the Quatrefolic Products.  Compl. ¶ 23.

Aceto has continuously used the Quatrefolic Mark in connection with the marketing, promotion and advertising for the Quatrefolic Products, as well as in connection with its relevant business transactions, throughout the United States. Compl. ¶ 24.  Substantial monies and resources have been invested and utilized in connection with advertising and promoting the Quatrefolic Mark for the Quatrefolic Products.  Compl. ¶ 25.

As a result of the marketing and promotion efforts and product sales, the Quatrefolic Mark has come to be recognized by purchasers within the pharmaceutical and nutraceutical industry as identifying the high-quality and consistent Quatrefolic Products.  Compl. ¶ 27.  Companies have come to trust the Quatrefolic Mark, and rely upon the quality, safety and effectiveness of products bearing the Quatrefolic Mark, and to associate the Quatrefolic Mark with the licensed and authorized sale and

distribution of the Quatrefolic Products by Aceto.  Compl. ¶ 28.

The Quatrefolic Mark has been continuously used by Aceto in marketing and promotional materials for the Quatrefolic Products in interstate commerce, and the Quatrefolic Mark has become, through widespread and favorable public acceptance and recognition, an asset of substantial value to Aceto as a symbol of goodwill and origin.  Compl. ¶ 29.  By virtue of Aceto's exclusive licensee rights, and its adoption and continuous use of the Quatrefolic Mark, Aceto is the exclusive licensee and owner of rights, title and interest in and to the Quatrefolic Mark in connection with the prescription pharmaceutical ingredient industry in the United States.  Compl. ¶ 30.

In connection with the process for distribution of the Quatrefolic Products throughout the United States, Aceto has entered into certain limited supply agreements, whereby Aceto provided companies with certain limited distribution rights and limited sub-licensing rights in connection with Quatrefolic Products and the Quatrefolic Mark.  Compl. ¶ 31.  These limited supply agreements include express limitations and restrictions to ensure that Aceto can properly protect its critical legal rights and intellectual property rights relating to the Quatrefolic Products and the Quatrefolic Mark, and to ensure that Aceto can properly control the distribution and marketing strategy for the Quatrefolic Products.  Compl. ¶ 32.

For one such limited supply agreement, Aceto and Pernix Therapeutics Holdings, Inc. ("Pernix") entered into the Semi-Exclusive Supply Agreement dated August 4, 2011 (the "Pernix Supply Agreement"), whereby Pernix agreed to purchase

exclusively the Quatrefolic Products from Aceto, and whereby Pernix obtained certain other limited rights to sub-license the Quatrefolic Products to third parties under specific circumstances and subject to specific conditions.  Compl. ¶ 33.  With respect to Pernix's limited rights, Section 4(b) of the Pernix Supply Agreement expressly provides that:

> Pernix shall be entitled to sub-license Product to one or more (as set forth on Appendix I) third parties ("Sub- Licensees"), provided, that (i) Pernix enters into written agreements with each such Sub-Licensee under terms consistent with this Agreement . . . , and (ii) Aceto remains the direct supplier of Product to each such Sub-Licensee, such that the Products will be shipped by Aceto directly to such Sub-Licensee. Aceto shall have the right to review and approve all proposed sub-license agreements . . .

Compl. ¶ 34.

Based upon the superior quality, effectiveness and reputation of the Quatrefolic Products, Defendants wanted to obtain the high-quality Quatrefolic Products, and to promote, use and sell the Quatrefolic Products in connection with a new line of prenatal vitamins, referred to as "Prena1" vitamins, that the Defendants intended to launch in interstate commerce and in the marketplace throughout the United States.  Compl. ¶ 35.  In furtherance of Defendants' plan to launch the new line of prenatal vitamins, Defendants evidently desired to become a "Sub-Licensee" with respect to the Quatrefolic Products and the Quatrefolic Mark, so that Defendants could obtain, utilize and sell the patented Quatrefolic Products in connection with the Defendants' prenatal vitamin Products, and so that Defendants could use the

Quatrefolic Mark in connection with the promotion, marketing, advertising and labeling for the Defendants' prenatal vitamin Products.  Compl. ¶ 36.

With respect to any proposed sub-licenses relating to the Quatrefolic Products, Defendants were expressly aware that "Aceto shall have the right to review and approve all proposed sub-license agreements," and that no proposed sub-license agreement could be legitimate or valid unless and until Aceto specifically approves such proposed sub-license agreement.  Compl. ¶ 37.  With respect to any proposed sub-licenses relating to the Quatrefolic Products, Defendants were also expressly aware that Aceto is required to be the "direct supplier" of all Quatrefolic Products to any and all proposed Sub- Licensees, and that all Quatrefolic Products to be acquired by any Sub- Licensees must be "shipped by Aceto directly to such Sub-Licensee." Compl. ¶ 38.

Defendants were also fully aware that Aceto had existing contractual rights under the Pernix Supply Agreement, including Aceto's contractual right to be the "direct supplier" and seller of all Quatrefolic Products to the proposed Sub-Licensees, and the contractual right and requirement that all proposed sub-license agreements must be approved by Aceto.  Compl. ¶ 39.  Defendants were also fully aware that Aceto held the exclusive legal rights for the sale and distribution of the Quatrefolic Products in the prescription market in the United States, and for the use of the Quatrefolic Mark in the United States.  Compl. ¶ 40.

Defendants never obtained any valid or legitimate sub-license with respect to the use, promotion or sale of the Quatrefolic Products, and Defendants never obtained any valid or legitimate sub-license to use the Quatrefolic Mark.  Compl. ¶ 41.  Specifically, Defendants never received authorization or approval from Aceto to obtain, utilize and sell the patented Quatrefolic Products in connection with the Defendants' "Prena1" prenatal vitamin products which are being marketed as "authorized generics prescription prenatals," and Defendants never received authorization or approval from Aceto to use the Quatrefolic Mark in connection with the promotion, marketing, advertising and labeling for the Defendants' "Prena1" generic prenatal vitamin product line.  Compl. ¶ 42.

Despite Defendants' knowledge regarding Aceto's contractual and legal rights relating to the Quatrefolic Products and the Quatrefolic Mark, the Defendants are actively engaged in an on-going pattern of improperly obtaining, utilizing, marketing and distributing Quatrefolic Products without any valid license or approval from Aceto.  Defendants are also engaged in the improper and misleading use of the identical Quatrefolic Mark in connection with the promotion and advertising of their competitive "Prena1" vitamin product line.  Compl. ¶ 43.

Defendants have improperly obtained Quatrefolic Products directly from Pernix in violation of and in circumvention of Aceto's legal and contractual rights, and Defendants are actively marketing, promoting and distributing unlicensed Quatrefolic Products and unlawfully using the Quatrefolic Mark in connection with Defendants

efforts to promote, market and sell their "Prena1" generic prenatal vitamin products in the marketplace throughout the state of Florida and the United States.  Compl. ¶ 44.  Defendants have intentionally induced and caused Pernix to improperly supply Defendants with the Quatrefolic Products in violation of Aceto's rights under the Pernix Supply Agreement.  Defendants are engaged in a pattern of unfair competition and other tortious activities in connection with Defendants unlicensed and unauthorized use of the Quatrefolic Mark, and Defendants' unlicensed promotion, use and sale of the Quatrefolic Products.  Compl. ¶ 46.

Among other things, in connection with Defendants new prenatal vitamin product line known as "Prena1," the Defendants are improperly using the Quatrefolic Mark, and are actively marketing, promoting and distributing unlicensed Quatrefolic Products in connection with and as a component and/or ingredient in their "Prena1" vitamin products.  Compl. ¶ 47.  On the Prena1 website, Defendants expressly state that the "Prena1 with Quatrefolic®" is "The ONLY Authorized Generics Prescription Prenatals with Quatrefolic® and life's DHA™."  Compl. ¶ 48.  The Defendants' website also includes an entire separate page with an unauthorized detailed description regarding the Quatrefolic Products, and the website states that the "Prena1 prescription prenatal vitamins are available at most retail and mail order pharmacies."  Compl. ¶ 49.

Defendants do not have any valid or legitimate sub-license or rights to use the Quatrefolic Mark or to use, sell and distribute the Quatrefolic Products in connection

with the "Prena1" generic prenatal vitamin product line.  Aceto has not authorized
Defendants to use the Quatrefolic Mark in connection with the "Prena1" generic
prenatal vitamin product line, nor has Aceto authorized Defendants to use, sell and
distribute the Quatrefolic Products in connection with the "Prena1" vitamins.  Compl.
¶ 50.

Defendants' repeated use of the Quatrefolic Mark on the "Prena1" website, on
the product labeling and on the marketing materials is improper, unlicensed,
unauthorized and misleading, and it falsely suggests an association and affiliation
with Aceto.  Compl. ¶ 51.  Defendants' use of the Quatrefolic Products in connection
with and as a component and ingredient of their "Prena1" product is improper,
unlicensed and unauthorized, and it falsely suggests an association and affiliation
with Aceto.  Compl. ¶ 52.  Defendants are improperly obtaining and selling the
Quatrefolic Products and using the Quatrefolic Mark in connection with their
"Prena1" vitamin product line in a manner which is likely to cause confusion as to the
source or sponsorship of the same.  Compl. ¶ 53.

Defendants are marketing and selling the Quatrefolic Products as a component
and active ingredient in their "Prena1" product line in order to unjustly obtain the
benefits associated with the high quality Quatrefolic Products, and to imply
improperly an association between the Defendants' new "Prena1" vitamin  product
line and Aceto's high-quality business and the Quatrefolic Products.  Compl. ¶ 54.
Defendants' improper use of the identical Quatrefolic Mark is likely to cause

confusion, mistake or deception as to the source or origin of their products in relation to pharmaceutical products of Aceto used in connection with the Quatrefolic Mark. Compl. ¶ 55.

Actual confusion has already occurred among customers and pharmaceutical professionals in the marketplace, and in further efforts to cause confusion, Defendants have improperly selected and utilized the "Prena1" product line name which is substantially similar the brand name being utilized by a valid and authorized sub-licensee of the Quatrefolic Products.  Compl. ¶ 56.  This unlicensed activity and improper conduct by Defendants is causing substantial irreparable harm and damage to Aceto, and is a direct violation of Aceto's legal and contractual rights.  Compl. ¶ 57.

Defendants were informed and aware that Aceto did not support and/or authorize a strategy of marketing, promoting and/or selling a generic prenatal vitamin product line in connection with the Quatrefolic Products or the Quatrefolic Mark, and that this was contrary to Aceto's strategic marketing plans for the Quatrefolic Products.  Compl. ¶ 58.  After discovering Defendants wrongful conduct and infringing activities, counsel for Aceto sent cease and desist correspondence to the Defendants notifying Defendants regarding their wrongful conduct and expressly requesting that Defendants "immediately refrain from any further unauthorized promotion, use and distribution of Quatrefolic Products, and that [Defendants] immediately remove the unauthorized 'Prena1 website' and remove all unauthorized

references to Quatrefolic Products on its marketing material, website and products.

In addition, all Quatrefolic Products and associated marketing, promotional and point

of sale materials that have been distributed must be recalled." *See* Aceto Cease and

Desist Letter dated November 8, 2012, attached to Complaint as Exhibit C.  Compl. ¶

59.

Despite Aceto's demands in the cease and desist letter, Defendants have not

ceased their improper conduct and Defendants continue the above alleged improper

and unlicensed conduct.  Compl. ¶ 60.  Defendants have been made aware of their

improper, unlicensed and unauthorized use of the Quatrefolic Product and the

Quatrefolic Mark, but Defendants have not stopped the infringing activities.  Compl. ¶

61.  Aceto has been substantially damaged and continues to be damaged by

Defendants' wrongful activities.  Compl. ¶ 62.

Defendants move to dismiss the complaint arguing Aceto has failed to join

required parties Gnosis S.P.A. and Pernix Therapeutics Holdings, Inc.; and that Counts

I, II, III, IV, V and VI fail to state a cause of action.  In the alternative, Defendants

move for a more definite statement.

## Standard of Review

For purposes of deciding a motion to dismiss, the Court accepts the allegations

of the complaint as true and views the facts in the light most favorable to it.  *See,*

*e.g., Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003); *Murphy v. Federal Deposit*

*Ins. Corp.*, 208 F.3d 959, 962 (11th Cir. 2000).  A plaintiff is required to allege "more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A complaint may be dismissed if the facts as pled do not state a claim for relief that is plausible on its face." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009)).  "[W]hile notice pleading may not require that the pleader allege a 'specific fact' to cover every element or allege 'with precision' each element of a claim, it is still necessary that a complaint 'contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory.'" *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001) (quoting *In re Plywood Antitrust Litigation*, 655 F.2d 627, 641 (5th Cir. 1981)).   A determination on "a motion to dismiss for failure to join a necessary and indispensable party requires the Court to accept the allegations of the complaint as true, and the [c]ourt may go outside the pleadings and look at extrinsic evidence." *Microsoft Corp. v. Cietdirect.com LLC*, 08-60668-CIV, 2008 WL 3162535 (S.D. Fla. Aug. 5, 2008) quoting *Rotec Indus., Inc. v. Aecon Group, Inc.*, 436 F. Supp. 2d 931, (N.D. Ill. 2006) (citing *Davis Co. v. Emerald Casino, Inc.*, 268 F.3d 477, 479-80 n.2, 4 (7th Cir.2001)).

<u>Discussion</u>

A.   <u>Joining Required Parties</u>

Defendants argue that the Complaint is subject to dismissal pursuant to

Federal Rule of Civil Procedure 19(a)(1)[3] ("Rule 19(a)(1)") for failure to join Gnosis

and Pernix as required parties, because without them, the Court will not be able to

_____

[3] Rule 19 states in pertinent part:

(a)   **Persons Required to Be Joined if Feasible**.

   (1)   *Required Party*.  A person who is subject to service of process and whose
joinder will not deprive the court of subject-matter jurisdiction must be
joined as a party if:
     (A)   in that person's absence, the court cannot accord complete relief
among existing parties; or
     (B)   that person claims an interest relating to the subject of the
action and is so situated that disposing of the action in the
person's absence may:
        (I)   as a practical matter impair or impede the person's ability
to protect the interest; or
        (ii)   leave an existing party subject to a substantial risk of
incurring double, multiple, or otherwise inconsistent
obligations because of the interest.

. . . .

(b)   **When Joinder Is Not Feasible**. If a person who is required to be joined if
feasible cannot be joined, the court must determine whether, in equity and
good conscience, the action should proceed among the existing parties or
should be dismissed. The factors for the court to consider include:

   (1)   the extent to which a judgment rendered in the person's absence might
prejudice that person or the existing parties;
   (2)   the extent to which any prejudice could be lessened or avoided by:
     (A) protective provisions in the judgment;
     (B) shaping the relief; or
     (C) other measures;
   (3)   whether a judgment rendered in the person's absence would be
adequate; and
   (4)   whether the plaintiff would have an adequate remedy if the action were
dismissed for nonjoinder.

Fed. R. Civ. P. 19.

provide complete relief between Plaintiff and Defendants, and because Defendants will be unnecessarily exposed to a substantial risk of incurring multiple or inconsistent obligations with respect to Plaintiff.

Rule 19 states a two-part test for determining whether a party is required. *Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.*, 669 F.2d 667, 669 (11th Cir. 1982). First, the court must ascertain under the standards of Rule 19(a) whether the person or entity in question is one who should be joined if feasible. If the person or entity should be joined, then the second part of the test involves inquiries regarding the feasibility of joinder or whether, applying the factors enumerated in Rule 19(b), the litigation may continue. *See, e.g., Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102 (1967).

The first step in analyzing the case at bar, therefore, is to decide whether Gnosis and Pernix are entities which should be joined if feasible under Rule 19(a). In making this decision, pragmatic concerns, especially the effect on the parties and the litigation, control. *Challenge Homes*, 669 F.2d at 669. The movant bears the burden of establishing that a party is necessary under Rule 19. *Hardy v. IGT, Inc.*, 2011 WL 3583745 (M.D. Ala. Aug. 15, 2011) citing *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1347 (11th Cir. 2011); *Microsoft Corp. v. Cietdirect.com LLC*, 2008 WL 3162535, *5 (S.D. Fla. Aug. 5, 2008).

**Gnosis**

Defendants assert that Gnosis, as the undisputed owner of the Quatrefolic Mark

and Quatrefolic Product, must be joined in this lawsuit because owners of allegedly

infringed trademarks are required parties in a lawsuit such as this.  For this

proposition, Defendants rely on *JTG of Nashville, Inc. v. Rhythm Band, Inc.*, 693

F.Supp 623 (M.D. Tenn. 1988), which holds,

> the licensor of a Trademark is usually treated as a necessary or
> indispensable party in an infringement action by its licensee.  Sound
> reasons support this rule.  The licensor of a Trademark that is the
> subject of an infringement action by a licensee falls squarely within the
> language and policy of [Rule 19].  As owner of the Mark, the licensor has
> a legally protected interest in the subject matter of the action.  A
> judgment for the alleged infringer, whether based on a finding that the
> licensed Mark is not a valid Trademark or that the defendant's Mark does
> not infringe it, may prejudice the licensor's rights in his own Mark.  A
> judgment for the plaintiff-licensee could result in double obligations for
> the defendant, should the licensor subsequently sue on his own.

*Id*. at 626 (citations omitted).

The pertinent portion of the Lanham Act relating to trademark infringement

actions provides that an infringer "shall be liable in a civil action by the registrant for

the remedies hereinafter provided."  Section 32(1) of the Lanham Act, 15 U.S.C. §

1114(1).  "Authorities uniformly agree that <u>only</u> the Trademark's <u>registrant</u> (or [the

<u>registrant's legal representatives</u>, <u>predecessors</u>, <u>successors</u>, and] <u>assignee</u>) may sue

under § 32(1)."  *Finance Inv. Co. (Bermuda) Ltd. v. Geberit AG*, 165 F.3d 526, 531 (7th

Cir. 1998) (emphasis added).  However, some courts consider "a truly exclusive

licensee, one who has the right even to exclude his licensor from using the Mark ...

[to be] equated with an assign[ee] since no right to use [the Mark] is reserved to the licensor, and the licensee's standing derives from his presumed status as an assignee." *Id.* at 531-32; *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 159 (1st Cir. 1977) (although termed a "licensee," plaintiff did not have the full powers of an "exclusive licensee" or assignee and thus did not have standing to assert federal statutory trademark infringement under the Lanham Trademark Act; nor did it have standing to seek relief for common law trademark infringement, since only the owner of the trademark may do so; however, plaintiff stated a claim for false designation and description and showed a sufficient nexus between itself and the defendant's alleged conduct to confer standing to sue).

With respect to a licensee, standing to sue depends largely on the rights granted to the licensee under the licensing agreement. *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1412 (11th Cir. 1998). Whether a transfer is an assignment or a license does not depend upon the name by which it calls itself but upon the legal effect of its provisions. *Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891). In this case, the Court is operating in the dark because the licensing agreement was not attached to the Complaint.

The Complaint alleges that Aceto entered into an "exclusive distribution and supply agreement with the product manufacturer, Gnosis S.P.A. of Milan, Italy," whereby "Aceto is the exclusive licensee in the United States to market, sell, and distribute a patented pharmaceutical ingredient product manufactured by Gnosis,

and known as Quatrefolic."  Compl. ¶ 20.  The Complaint also alleges that pursuant to

the distribution agreement with Gnosis, Aceto has "the exclusive license and rights

within the United States to use, promote and sub-license the trademarks and trade-

names associated with the Quatrefolic Products, including but not limited to, the

registered Trademark Quatrefolic."  Compl. ¶ 21.  The Complaint further alleges that

pursuant to its "exclusive distribution agreement with Gnosis," Aceto has the

"exclusive license and rights within the United States to use, sell, offer for sale and

import the patented Quatrefolic Products."  Compl. ¶ 22.  According to Aceto, its

allegation that it "is the exclusive licensee and owner of rights, title and interest in

and to the Quatrefolic Mark . . . in the United States" adequately establishes its

independent standing to sue.  Compl. ¶ 30.  What seems to be missing is the

allegation that Gnosis *assigned* to Aceto ownership rights to the marks or that Aceto is

the owner of *all substantial* rights in the United States.

An exclusive licensee may have a property interest in the trademark and

standing to enforce it.  *See e.g., Camp Creek,* 139 F.3d at 1412 (exclusive licensee

had standing to enforce trademark where (1) it was granted exclusive use of "all of

[registrant's] intellectual property" in United States including trademark, (2) the

agreement did not restrict licensee's ability to enforce, and (3) the agreement was

silent as to whether registrant retained ownership of the trademark); *Drew Estate*

*Holding Co., LLC v. Fantasia Distribution, Inc.*, 875 F. Supp. 2d 1360, 1366 (S.D. Fla.

2012) (exclusive licensee of mark had standing to bring claim alleging unfair

competition under Lanham Act arising out of producer's use of mark, since license agreement for mark granted licensee right to use mark on all tobacco products, right to initiate lawsuits to enforce its rights in mark and products at issue in the action); *Hako-Med USA, Inc. v. Axiom Worldwide, Inc.*, 2006 WL 3755328 at *6 (M.D. Fla. Nov. 15, 2006) ("Essential rights that the court should examine are 'the right of exclusivity, the right to transfer and most importantly the right to sue infringers.  The court should also consider the rights that the patentee reserved for himself'") (citation omitted).  However, an exclusive licensee without all substantial rights in the patent or mark has standing to sue third parties only as a co-plaintiff with the patentee.  *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001); *Nat'l Licensing Ass'n, LLC. v. Inland Joseph Fruit Co.*, 361 F. Supp. 2d 1244, 1250 (E.D. Wash. 2004).

"The statute and the majority of cases interpreting it creates a clear and bright line rule: only the registrant of record has standing to sue for the rights and remedies provided by Lanham Act § 32(1) for the owner of a registered mark.  No amount of judicial interpretation or manipulation of words can turn an exclusive licensee into an assignee.  A trademark assignment and license are two quite different transactions with widely different impacts."  6 McCarthy on Trademarks and Unfair Competition § 32:3 (4th ed.).  Here, there is no evidence or allegations relative to an assignment.

Plaintiff cites this Court's ruling in *Geltech Solutions, Inc. v. Marteal, Ltd.*, 09-CV-81027, 2010 WL 1791423 (S.D. Fla. May 5, 2010) for support that, as an exclusive licensee, it may bring suit against a purported infringer without Gnosis's participation.  When addressing the issue of *standing* to sue to protect a trademark from infringement, this Court held in *Geltech Solutions, Inc. v. Marteal, Ltd.*, 09-CV-81027, 2010 WL 1791423 (S.D. Fla. May 5, 2010) that exclusive licensees of trademarks have *standing* to sue to protect a trademark from infringement:

> In order to bring a Trademark infringement suit under 15 U.S.C. § 1114, the plaintiff must be a "registrant," a term that only encompasses the Trademark registrant and its "legal representatives, predecessors, successors and assigns." 15 U.S.C. § 1127. Trademark licensees thus typically do not have standing to sue under § 1114. *See Finance Inv. Co. (Bermuda) Ltd. v. Geberit AG*, 165 F.3d 526, 531 (7th Cir.1998). Courts have held, however, that exclusive licensees of Trademarks can sue to protect the Trademark from infringement.  *See Westowne Shoes, Inc. v. Brown Group, Inc.*, 104 F.3d 994, 997 (7th Cir.1997); *Experian Marketing Solutions, Inc. v. U.S. Data Corp.*, No. 8:09CV24, 2009 WL 2902957, *3–*4 (D. Neb. 2009) (collecting cases). The standing conferred to exclusive Trademark licensees is not unique; exclusive licensees of a patent or copyright may also bring suit against an infringer without the intellectual property owner's participation.  *See, e.g., Textile Productions, Inc. v. Mead Corp.*, 134 F.3d 1481, 1483–84 (Fed. Cir. 1998); *Imperial Residential Design, Inc. v. Palms Development Group, Inc.*, 29 F.3d 581, 583 (11th Cir. 1994).

*Id.* at *3.  The question of standing, however, is a related but different issue than the question of whether a certain party should be joined.  Defendants are not challenging standing; they argue that the mark owner Gnosis must be joined.  Indeed, in a case cited in the excerpt above, the Federal Circuit held that "although a patentee has standing to sue in its own name, an exclusive licensee that does not have all

substantial rights has standing to sue third parties only as a co-plaintiff with the patentee." *Textile Productions,* 134 F.3d at 1484.  This holding, which does not address Rule 19, suggests that only if Aceto owns or controls *all substantial rights* in the Quatrefolic Product and the Quatrefolic Mark, or can show that its status is one of an assignee, may it enforce the rights controlled by those patent and trademark rights.

Plaintiff relies on the following cases for the proposition that Gnosis is not a required party.  *Finance Inv. Co. (Bermuda) Ltd. v. Geberit AG,* 165 F.3d 526 (7th Cir. 1998) ("*Geberit*"), cited earlier, states that the right to sue as an "exclusive licensee" depends on the language of its license agreement.  *Id*. at 532. "[A] truly exclusive licensee" has standing because it has the right even to exclude its licensor from using the Mark since the licensee's standing derives from its presumed status as an assignee.  *Id*. at 532-33.  While not addressing Rule 19, *Geberit* supports Aceto's standing to sue Defendants without Gnosis's participation if Aceto is a "*truly* exclusive licensee."  Unfortunately, the terms of Gnosis's and Aceto's agreement are unknown and it is therefore impossible to know if Aceto is a "*truly* exclusive licensee."  Aceto does not allege in the Complaint that it is or otherwise has the right to exclude Gnosis from using the Quatrefolic Mark.

Other cases Plaintiff maintains support its cause include *Total Petroleum Puerto Rico Corp. v. TC Oil, Corp.,* 634 F. Supp. 2d 212, 216 (D. P.R. 2009), *Informix Software, Inc. v. Oracle Corp.,* 927 F. Supp. 1283 (N.D. Cal. 1996), *Ferrero U.S.A.,*

*Inc. v. Ozak Trading, Inc.*, 753 F. Supp. 1240 (D. N.J. 1991), and *Vaupel*

*Textilmaschinen KG v. Meccanica Euro Italia SPA,* 944 F.2d 870 (Fed. Cir. 1991).  In

*Total Petroleum*, a Rule 19 motion was denied because, among other reasons, the

owner of the trademark had delegated to Plaintiff the obligation to sue for trademark

infringement.  Unlike *Total Petroleum*, there is no evidence or allegation in this case

that Gnosis delegated to Aceto the obligation to sue for trademark infringement.

Informix Software, Inc. v. Oracle Corp., 927 F. Supp. 1283 (N.D. Cal. 1996)

does not address Rule 19 and the parenthetical quote cited by Plaintiff is merely the

court's reference to a party's argument.  The holding of *Informix*, that the owner of a

trademark is the only proper defendant in a suit for cancellation of that trademark, is

not relevant to the issue at hand.  *Id*. at 1286.

*Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 753 F. Supp. 1240 (D. N.J. 1991),

*rev'd on other grounds, Ferrero U.S.A., Inc. v. Ozark Trading, Inc.*, 952 F.2d 44 (3d

Cir. 1991) acknowledges that an exclusive user of a trademark (Ferrero USA) by a

corporation affiliated with the owner of the trademark (Ferrero S.p.A.) had standing

to sue an infringer without requiring participation of the owner of the trademark.

*Ferrero U.S.A.* is readily distinguishable from the case at hand since Plaintiff is not

alleged to be a company affiliated with Gnosis.

In *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA,* 944 F.2d 870, 875

(Fed. Cir. 1991) the court concluded the exclusive licensee could sue without joining

the patent owner because the agreements between the parties "although not

constituting a formal assignment of the U.S. patent, were a grant of all substantial rights and, in accordance with Rule 19, permitted [the exclusive licensee] to sue without joining [the patent owner]."  The *Vaupel* Court sagely noted that "[w]hether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions."  *Id., citing Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891). Therefore, the use of the term "exclusive license" in both *Vaupel* and in this case is not dispositive; what the documents, in fact, recite is dispositive.  Since there is no indication that Gnosis has granted Aceto an assignment or "all substantial rights," including the right to sue without joining it, the Court finds Aceto's argument that it does not need to join Gnosis because it is an exclusive licensee unpersuasive on the present record.

In *Independent Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459 (1926) ("*Independent Wireless*"), an exclusive licensee sought to enforce patent rights against an alleged infringer.  The Supreme Court rejected the argument that the licensee could sue for infringement without joining the patent owner.  "The presence of the owner of the patent as a party is indispensable not only to give jurisdiction under the patent laws," the Court held, "but also, in most cases, to enable the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in the one action, or by satisfying one adverse

decree to bar all subsequent actions."[4]  *Independent Wireless*, 269 U.S. at 468.  *See also, Abbott Laboratories v. Diamedix Corp.*, 47 F.3d 1128, 1131 (Fed. Cir. 1995) ("*Abbott Labs*") ("The right to sue for infringement is ordinarily an incident of legal title to the patent.  A licensee may obtain sufficient rights in the patent to be entitled to seek relief from infringement, but to do so, it ordinarily must join the patent owner"); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 & n.7 (Fed. Cir. 1991) (one seeking damages for infringement ordinarily must have legal title to the patent during the infringement, but an exclusive licensee may join an infringement suit as co-plaintiff with patentee); *Weinar v. Rollform Inc.*, 744 F.2d 797, 806-07 (Fed. Cir. 1984) (licensee with exclusive right to sell licensed products may sue for and obtain relief from infringement in conjunction with patent owner), *cert. denied*, 470 U.S. 1084 (1985).

Thus, unless Plaintiff is an exclusive licensee with all substantial rights in the trademark, all entities with an independent right to enforce the Quatrefolic Mark are indispensable or necessary parties to this infringement suit.  When such an entity

---

[4] The Court recognized an exception to that rule for cases in which the owner of a patent refuses or is unable to be joined as a co-plaintiff with the exclusive licensee in an infringement action.  In such a case, the Court held, "the licensee may make [the patent owner] a party defendant by process and he will be lined up by the court in the party character which he should assume."  269 U.S. at 468.  A patentee, the Court explained, "holds the title to the patent in trust for [the exclusive] licensee, to the extent that he must allow the use of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to his exclusive right by an infringer or to enjoin infringement of it."  *Id*. at 469.  The Court emphasized, however, that before the exclusive licensee can sue in the patent owner's name, the patent owner must be given an opportunity to join the infringement action.  *Id*. at 473-74.

declines to join in the suit it may be joined involuntarily, either as a party plaintiff or party defendant; the purpose is to assure that all interested parties are before the court and that their interests are considered.[5]  *Abbott Labs*, 47 F.3d at 1133 ("A patentee that does not voluntarily join an action prosecuted by its exclusive licensee can be joined as a defendant or, in a proper case, made an involuntary plaintiff if it is not subject to service of process.")

The joinder of an absent entity which should be a plaintiff as an involuntary plaintiff is authorized by the second half of the third sentence of Rule 19(a).  The purpose of this procedure is to mitigate some of the harshness that occasionally results when the joinder of a nonparty is found to be desirable but the nonparty refuses to join in the action.  Its most typical application has been to allow exclusive licensees of patents and copyrights to make the owner of the monopoly an involuntary plaintiff in infringement suits.  *In re OSB Antitrust Litigation*, 2009 WL 129737, *3 (E.D. Pa. 2009) citing 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1606 (3d ed. 2001);  *Ferrara v. Rodale Press, Inc.*, 54 F.R.D. 3 (E.D. Pa. 1972).

---

[5]  The Notes of the Advisory Committee on Rules state that "[f]or example of a proper case for involuntary plaintiff, see *Independent Wireless Teleg. Co. v. Radio Corp. of America*, 269 U.S. 459 [46 S.Ct. 166]."  In *Independent Wireless*, the Supreme Court ruled that where a patent owner outside the jurisdiction of the court has notice of an infringement suit brought by its exclusive licensee, but refuses to join, the patent owner should be made an involuntary plaintiff.

Unless Plaintiff can demonstrate that it is an assignee, or the legal equivalent of an assignee of the trademark, Gnosis, as the owner of the Quatrefolic Mark and Quatrefolic Product, should be joined for just adjudication in this matter which seeks injunctive and declaratory relief.  Moreover, a favorable resolution in Defendants' favor could, "as a practical matter impair or impede (the absent party's) ability to protect (its) interest" - an interest that is apparent since it is the owner of the Quatrefolic Mark and Quatrefolic Product.  *See Haas v. Jefferson Nat. Bank of Miami Beach,* 442 F.2d 394, 398 (5th Cir. 1971).  Gnosis's absence could also expose Defendants "to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations."  Rule 19(a)(1)(B).  If Defendants prevail in this litigation in the absence of Gnosis, Gnosis, not being bound by res adjudicata or collateral estoppel, could theoretically proceed in later litigation against these same Defendants.

Since the parties do not address the feasibility of Gnosis's joinder, the Court presumes Gnosis is subject to service of process and that its joinder will not deprive the court of subject-matter jurisdiction.  Rule 19(a) allows for the joinder of an entity who should join with plaintiff but refuses to do so by making that entity a defendant, or, in a proper case,[6] an involuntary plaintiff.  7 Fed. Prac. & Proc. Civ. §

_____

[6] *See, e.g., Murray v. Mississippi Farm Bureau Cas. Ins. Co.*, 251 F.R.D. 361, 364 (W.D .Wis .2008) ("Traditionally, a 'proper case' is one in which the involuntary plaintiff is outside the court's jurisdiction and is under some obligation to join the plaintiff's lawsuit but has refused to do so.") *citing, inter alia, Independent Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 472 (1926).

1606 (3d ed.)  The involuntary-plaintiff procedure has been used to allow the exclusive licensee of a patent to prosecute an action by compelling the joinder of the owner.  *Id.*; *Merck & Co. v. Smith*, 261 F.2d 162 (3d Cir. 1958); *Paul E. Hawkinson Co. v. Carnell*, 112 F.2d 396 (3d Cir. 1940); *Deitel v. Chisholm,* 42 F.2d 172 (2d Cir. 1930), *cert. denied* 51 S.Ct. 78; *Collins v. Hupp Motor Car Corp.*, 22 F.2d 27 (6th Cir. 1927); *Goldhaft v. Moorhouse*, 306 F.Supp. 533 (D.C. Minn. 1969) (a nonexclusive licensee was permitted to make the patent owner an involuntary plaintiff when it was suing for damages for an infringement that had occurred at a time when plaintiff was an exclusive licensee); *Pratt & Whitney Co. v. U.S.*, 153 F.Supp. 409 (Ct. Cl. 1957); *Diebold, Inc. v. Record Files, Inc.*, 11 F.R.D. 543 (D.C. Ohio 1951).  Accordingly, the motion to dismiss for failure to join Gnosis will be granted with leave to amend to either demonstrate that it is an assignee, or the legal equivalent of an assignee of the trademark, or to name Gnosis as either a plaintiff or a defendant.  *Chiropartners, Inc. v. Gravely*, 2012 WL 4050840, *3 (S.D. Ala. Aug. 24, 2012).

**Pernix**

Aceto argues that Pernix must also be joined "because the rights of Plaintiff and Defendants concerning the use of the Quatrefolic Product and Quatrefolic Mark cannot be settled without a determination of Pernix's rights under the Plaintiff/Pernix Agreement and any subsequent sublicense agreements."  DE 8 at 10. The Complaint's allegations relative to Pernix are as follows:

In connection with the process for distribution of the Quatrefolic Products throughout the United States, Aceto has entered into certain limited supply agreements, whereby Aceto provided companies with certain limited distribution  rights and limited sub-licensing rights in connection with Quatrefolic Products and the Quatrefolic Mark.  Compl. ¶ 31.  These limited supply agreements include express limitations and restrictions to ensure that Aceto can properly protect its critical legal rights and intellectual property rights relating to the Quatrefolic Products and the Quatrefolic Mark, and to ensure that Aceto can properly control the distribution and marketing strategy for the Quatrefolic Products.  Compl. ¶ 32.

For one such limited supply agreement, Aceto and Pernix Therapeutics Holdings, Inc. ("Pernix") entered into the Semi-Exclusive Supply Agreement dated August 4, 2011 (the "Pernix Supply Agreement"), whereby Pernix agreed to purchase exclusively the Quatrefolic Products from Aceto, and whereby Pernix obtained certain other limited rights to sub-license the Quatrefolic Products to third parties under specific circumstances and subject to specific conditions. Compl. ¶ 33.  With respect to Pernix's limited rights, Section 4(b) of the Pernix Supply Agreement expressly provides that:

Pernix shall be entitled to sub-license Product to one or more (as set forth on Appendix I) third parties ("Sub- Licensees"), provided, that (I) Pernix enters into written agreements with each such Sub-Licensee under terms consistent with this Agreement . . . , and (ii) Aceto remains the direct supplier of Product to each such Sub-Licensee, such that the Products will be shipped by Aceto directly to such Sub-Licensee. Aceto shall have the right to review and approve all proposed sub-license agreements . . .

Compl. ¶ 34.

Based upon the superior quality, effectiveness and reputation of the  Quatrefolic Products, Defendants wanted to obtain the high-quality Quatrefolic Products, and to promote, use and sell the Quatrefolic Products in connection with a new line of prenatal vitamins, referred to as "Prena1" vitamins, that the Defendants intended to launch in interstate commerce and in the marketplace throughout the United States.  Compl. ¶ 35.  In furtherance of Defendants' plan to launch the new line of prenatal vitamins, Defendants evidently desired to become a

"Sub-Licensee" with respect to the Quatrefolic Products and the Quatrefolic Mark, so that Defendants could obtain, utilize and sell the patented Quatrefolic Products in connection with the Defendants' prenatal vitamin Products, and so that Defendants could use the Quatrefolic Mark in connection with the promotion, marketing, advertising and labeling for the Defendants' prenatal vitamin Products. Compl. ¶ 36.

Defendants were also fully aware that Aceto had existing contractual rights under the Pernix Supply Agreement, including Aceto's contractual right to be the "direct supplier" and seller of all Quatrefolic Products to the proposed Sub- Licensees, and the contractual right and requirement that all proposed sub-license agreements must be approved by Aceto.  Compl. ¶ 39.

Defendants have improperly obtained Quatrefolic Products directly from Pernix in violation of and in circumvention of Aceto's legal and contractual rights, and Defendants are actively marketing, promoting and distributing unlicensed Quatrefolic Products and unlawfully using the Quatrefolic Mark in connection with Defendants efforts to promote, market and sell their "Prena1" generic prenatal vitamin products in the marketplace throughout the State of Florida and the United States.  Compl. ¶ 44.  Defendants have intentionally induced and caused Pernix to improperly supply Defendants with the Quatrefolic Products in violation of Aceto's rights under the Pernix Supply Agreement.  Defendants are engaged in a pattern of unfair competition and other tortious activities in connection with  Defendants unlicensed and unauthorized use of the Quatrefolic Mark, and Defendants' unlicensed promotion, use and sale of the Quatrefolic Products.  Compl. ¶ 46.

There is no body of law that states that an infringement suit cannot be

maintained without joinder of a sublicensee.  Defendants make no valid argument

why the rights of Aceto and Defendants cannot be settled without Pernix's

participation in this suit.  Reference to Aceto's agreement with Pernix is all that

might be required.  While Pernix clearly has rights, it is not Pernix's rights that are at

issue in this matter.  There is no need for Pernix to be included in this action in order

for Aceto to obtain the complete relief it is requesting and Defendants have not

shown how there would be a risk of inconsistent obligations vis-a-vis Pernix.  Having

failed to carry their burden of demonstrating that Pernix is necessary under Rule 19,

the motion to dismiss for failing to join Pernix is denied.  *See supra* note 2.

B.     **Stating a Cause of Action**

       **Counts I, II and V.**

       Defendants argue Counts I and II (Plaintiff's Lanham Act claims) and Count V

(injury to business reputation and dilution in violation of Fla. Stat. § 495.151, the

Florida Registration and Protection of Trademarks Act) should be dismissed for lack of

standing because Aceto is not the "owner" of the Quatrefolic Mark.   Defendants

assert that "Plaintiff does not allege that it is Gnosis' assignee, nor does Plaintiff

allege any right conferred upon it by the Gnosis/Plaintiff Agreement, or otherwise,

that would provide Plaintiff with the right to unilaterally initiate legal action to

protect the Quatrefolic Mark and Quatrefolic Product."  DE 8 at 11.  Aceto responds

that by alleging that it is an exclusive licensee, which is generally held to be the

equivalent of an assignee, it may sue to protect the trademark from infringement.

       As discussed at length above, Aceto has not established standing under Section

43(a) of the Lanham Act, so Counts I and II are properly dismissed without prejudice.

The parties agree that the same legal principles govern federal and Florida state

causes of action for dilutions.  *See Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d

792, 801 (11th Cir. 2003).  Accordingly, for the same reason Counts I and II are dismissed, Count V is also dismissed without prejudice.

**Count III**

Defendants next seek dismissal of Count III for Florida common law unfair competition by arguing that it "fails to state a cause of action for common law unfair competition because it does not allege that Plaintiff and Defendants are competitors."  DE 8 at 13.  This argument is rejected.  Aceto alleges that Defendants have engaged in "false and deceptive advertising" and other "competitive and deceptive conduct" in furtherance of its improper scheme.  Compl. ¶¶ 79, 81-83, 86. Furthermore, Aceto alleges that Defendants are engaged in "unfair competition" by acting as competitors with respect to their "promotion and advertising of their competitive Prena1 vitamin produce line."  Compl. ¶¶ 42-43, 67, 86.  The motion to dismiss Count III based on the argument that Plaintiff failed to allege that Plaintiff and Defendants are competitors is denied.

**Count IV**

In Count IV, Plaintiff asserts a claim for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*  Defendants argue that this claim must be dismissed because Plaintiff is not a consumer, and only consumers may assert claims under the FDUTPA.  Plaintiff responds that a non-consumer legitimate business enterprise may state a claim for violation of the FDUTPA.

The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" *Id*. § 501.204(1).  The Act's purpose is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *Id*. § 501.202(2).  A practice is unfair if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (internal quotation marks omitted). Courts are to construe the FDUTPA liberally.  Fla. Stat. § 501.202.

Before 2001, the FDUTPA allowed "a consumer who has suffered a loss as a result of a violation" of the FDUTPA to bring a cause of action.  Fla. Stat. § 501.211(2) (2000)).  The Florida Legislature amended § 501.211(2) to replace "consumer" with "person" in 2001.  *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1176 (M.D. Fla. 2005); *see also* Fla. Stat. § 501.211(2) ("a person who has suffered a loss as a result of a violation").  Since that amendment, courts have disagreed as to whether nonconsumers may bring a private action under the FDUTPA. *See, e.g., Intercoastal Realty, Inc. v. Tracy*, 706 F. Supp. 2d 1325, 1334–35 (S.D. Fla. 2010) (Cohn, J.) (discussing cases, including this Court's holding in *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1349-50 (S.D. Fla. 2009) (Marra, J.)); *Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1373–74 & n.9 (S.D. Fla.

2010) (Moreno, J.) (finding that non-consumers may sue under FDUTPA because of the 2001 amendment to the statute).

Defendants urge this Court to follow its prior decision in the cases of *Cannova v. Breckenridge Pharmaceutical, Inc.,* 2009 WL 64337, *3 (S.D. Fla. Jan. 9, 2009) (dismissing FDUTPA claim because plaintiff failed to allege he acted as a consumer in the conduct of trade or commerce) and *Kertesz v. Net Transactions, Ltd.,* 635 F. Supp. 2d 1339, 1349-50 (S.D. Fla. 2009) (holding that plaintiff, as a non-consumer, was not entitled to bring a claim for monetary damages under FDUTPA).  In those cases, this Court came out on the side of the split that interpreted FDUPTA to only allow *consumers* to bring claims for damages under the Act.  In *Cannova* and *Kertesz,* however, the FDUPTA plaintiffs were *individuals* who did not "act in some manner as a consumer in the conduct of trade or commerce."  This Court did not consider whether "a legitimate business enterprise," as opposed to an individual non-consumer, would have standing to seek monetary damages under FDUTPA.  *See Kertesz,* 635 F. Supp. 2d at 1349.

On its face, the FDUTPA statute seeks "[t]o protect the consuming public <u>and</u> *legitimate business enterprises* from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.202(2) (emphasis added).  It is unclear if the word "consuming" applies to only "public" or also to "legitimate business enterprises."  "The more natural reading is that this clause lists two independent

groups that the Act seeks to protect:  first, 'the consuming public,' and second, 'legitimate business enterprises.'"  *In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation*, 834 F. Supp. 2d 566, 604 (S.D. Tex. 2011) citing *Akzo Nobel Coatings, Inc. v. Auto Paint & Supply of Lakeland, Inc.*, 2011 WL 5597364, at *3 (M.D. Fla. Nov. 17, 2011) (holding that "whether or not an individual non-consumer plaintiff has standing [under the Act], a legitimate business enterprise *does*") (emphasis in original); *Intercoastal Realty*, 706 F. Supp. 2d at 1335 (allowing a claim by a "legitimate business enterprise" without regard to whether the business was a consumer).

Thus, this Court's rulings in *Cannova* and *Kertesz* are inapposite.  Here, because Aceto has alleged that it is a legitimate business enterprise and that Defendants have engaged in wrongful activities in trade and commerce, the Court will not dismiss Count IV because it is not alleged that Plaintiff is a "consumer."  Compl. ¶¶ 14-16, 44, 47, 51, 54, 56, 90.

### Count VI

Count VI alleges Florida common law unjust enrichment.  A claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying for its value.  *Fla. Power Corp. v. City of Winter Park*, 887 So.2d 1237, 1241 n.4 (Fla. 2004) (quoting *Ruck Bros. Brick, Inc. v. Kellogg & Kimsey,*

*Inc.*, 668 So.2d 205, 207 (Fla. Dist. Ct. App.1995)).  In Florida, the law of unjust enrichment requires a benefit to pass directly from the plaintiff to the defendant and that there be no available legal remedy at law.  *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012); *Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913, *10 (S.D. Fla. Jan. 10, 2013).  While the theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy, a plaintiff may maintain an unjust enrichment claim in the alternative to its legal claims.  *Johnson Controls, Inc. v. Uribazo*, 2012 WL 6652934, at *2 (S.D. Fla. Dec. 21, 2012); *Court-Appointed Receiver of Lancer Offshore, Inc. v. Citco Group Ltd.*, 2008 WL 906101, *5 (S.D. Fla. March 31, 2008).

Defendants assert that Aceto's claim for unjust enrichment should be dismissed because "Plaintiff has failed to allege that Plaintiff conferred any benefit directly upon Defendants," and also because Aceto "does not allege that it lacks an alternative legal remedy for what it claims to be Defendants' alleged wrongful conduct."

**Direct Benefit**

Defendants argue that Aceto's unjust enrichment claim must fail because it has not alleged a direct benefit conferred on Defendants by Aceto, but rather by Pernix which directly supplied Defendants with allegedly unauthorized Quatrefolic Products.  "Now, unhappy that Defendants allegedly obtained the Quatrefolic Mark and Quatrefolic Product from Pernix, Plaintiff is alleging - in its Response only - that

it conferred an indirect benefit upon Defendants.  Significantly, there is no such

allegation in Plaintiff's Complaint."  DE 14.  Two issues are presented in this

argument.  One, any claim for unjust enrichment where the benefit is conferred

through an intermediary must fail, and two, no allegation of such an intermediary

conferred benefit is made in the complaint.  Aceto responds that an unjust

enrichment claim is appropriate where it is alleged, as in this case, that Plaintiff

conferred the benefit through an intermediary third party.

A benefit may be inferred when an entity enriches itself unjustly to the

detriment of another.  That entity should be required to make restitution of all the

benefits received, retained, or appropriated when it appears that to require it would

be just and equitable.  11 Fla. Jur. 2d <u>Contracts</u> § 288; *Tracfone Wireless, Inc. v.*

*Access Telecom, Inc.*, 642 F. Supp. 2d 1354 (S.D. Fla. 2009).  There are several recent

cases in this district that permit an unjust enrichment claim to stand where the

benefit is conferred through an intermediary, pointing out that direct *contact*, or

privity, is not the equivalent of conferring a direct *benefit*.  In *Williams v. Wells*

*Fargo Bank N.A.*, 2011 WL 4901346 (S.D. Fla. Oct. 14, 2011), the Court explained:

> just because the benefit conferred by Plaintiffs on Defendants did not
> pass directly from Plaintiffs to Defendants — but instead passed through
> a third party — does not preclude an unjust-enrichment claim.  Indeed
> to hold otherwise would be to undermine the equitable purpose of
> unjust enrichment claims. *See* 11 Fla. Jur. 2d Contracts § 288 ("[I]f
> someone does enrich himself unjustly to the detriment of another, that
> person should be required to make restitution of all the benefits
> received, retained, or appropriated when it appears that to require it
> would be just and equitable.").  It would not serve the principles of

justice and equity to preclude an unjust enrichment claim merely
because the "benefit" passed through an intermediary before being
conferred on a defendant.

*Id*. at *5.  *See also Romano v. Motorola, Inc.*, 07-CIV-60517, 2007 WL 4199781 (S.D.

Fla. Nov. 26, 2007) (allowing unjust enrichment claim where manufacturer marketed

its product directly to consumers but sold its product through an intermediary);

*Ulbrich v. GMAC Mortgage, LLC,* 11-62424-CIV, 2012 WL 3516499 (S.D. Fla. Aug. 15,

2012) (allegations that Balboa charged Plaintiff inflated premiums for the forced

placed coverage and "skimmed the excess for themselves" sufficient to show that

Plaintiff, by paying the allegedly excessive premiums, conferred a direct benefit on

Balboa); *but see*, *Swiss Watch Int'l, Inc. v. Movado Grp., Inc.*, 00-7703-CIV, 2001 WL

36270979 (S.D. Fla. Sept. 5, 2001) (dismissing claim for unjust enrichment where

allegations relating to Plaintiff's "help" in curbing sales to vendors outside of the

United States failed to allege that Plaintiff conferred a direct benefit on Defendant

that would be inequitable for Defendant to retain).  *See also*, Daniel R. Karon,

Undoing the Otherwise Perfect Crime — Applying Unjust Enrichment to Consumer

Price-Fixing Claims,108 W. Va. L. Rev. 395, 421 (2005).  The Court will not dismiss

Aceto's unjust enrichment claim because the Complaint alleges that Pernix, rather

than Aceto, sold Defendants the allegedly infringing products.

　　Moving on to whether Aceto alleges a benefit conferred, the Court examines

Count VI and notes paragraphs 104 and 105 of the Complaint allege, "Defendants' use

of the infringing identical Quatrefolic Mark and Defendants' unlicensed and

unauthorized use of the Quatrefolic Products are benefits conferred upon Defendants and Defendants have knowledge of such benefits.  Defendants have knowingly accepted and retained the benefits of their use of the Quatrefolic Mark and the Quatrefolic Products."  Construing the Complaint in Plaintiff's favor, the Court finds Count VI adequately alleges a benefit (the use of the mark and products) which Defendants are alleged to unjustly benefit from to the detriment of Aceto.  Accordingly, Defendants motion to dismiss for failure to state a claim for unjust enrichment is denied.

Finally, Defendants assert that Plaintiff has not alleged that it lacks alternative legal remedies.  This argument is rejected.  The last paragraph of Count VI, paragraph 109, clearly states: "Defendants' are continuing to earn revenues and profits to which they are not legally entitled, causing irreparable injury to Aceto by the aforesaid acts of Defendants *for which Aceto has no adequate remedy at law*" (emphasis added).  Thus, while Aceto may not recover under both legal and equitable theories, there is no basis for dispensing with Plaintiff's unjust enrichment claim at the motion to dismiss stage.  *See, e.g., Healthcare Appraisers, Inc. v. Healthcare FMV Advisors, LLC*, 2011 WL 4591960, at *10 (S.D. Fla.  Sept. 30, 2011); *Williams v. Bear Stearns & Co.*, 725 So.2d 397, 400 (Fla. Dist. Ct. App. 1998) (it is not upon the allegation of the existence of a contract, but upon a showing that an express contract exists that the unjust enrichment count fails).

<u>More Definite Statement</u>

Defendants assert in the alternative that Plaintiff should be ordered to file a more definite statement identifying its basis for standing related to its claims against Defendants in Counts I, II and V, either in the form of attaching the Gnosis/Plaintiff and Plaintiff/Pernix Agreements to the Complaint, or alternatively by quoting the specific provisions of those agreements which it claims confer standing upon the Plaintiff to bring the claims asserted in this lawsuit.  As the Court has ruled that Gnosis is a required party, and that Pernix is not, this alternative argument is moot.

<u>Conclusion</u>

In accordance to the findings and conclusions stated above, it is hereby

ORDERED AND ADJUDGED that Defendants' Motion to Dismiss Complaint and for more Definite Statement [DE 8] is granted in part and denied in part.  Plaintiff may file an Amended Complaint complying with the dictates reiterated above on or before August 5, 2013.  Fed. R. Civ. P. 15(a).

DONE AND ORDERED in Chambers at West Palm Beach, Palm Beach County, Florida, this 16th day of July, 2013.

_____
KENNETH A. MARRA
United States District Judge